UNITED STATES of America,
Appellee,

v.

William Ross PHILLIPS, Appellant.

No. 73-2078.

United States Court of Appeals,
Ninth Circuit.

March 11, 1974.

Rehearing Denied Aug. 5, 1974.

David E. Kenner (argued), of Kenner & Stein, Los Angeles, Cal., for appellant.

William D. Keller, U. S. Atty., Eric A. Nobles, Joel Levine, Asst. U. S. Attys. (argued), Los Angeles, Cal., for appellee.

Before ELY and GOODWIN, Circuit Judges, and MURRAY,* District Judge.

## OPINION

WILLIAM D. MURRAY, District Judge:

William Ross Phillips appeals his conviction for conspiring to distribute controlled substances in violation of 21 U.S. C. § 846 and for possessing, with intent to distribute, cocaine and heroin, in violation of 21 U.S.C. § 841(a)(1). He contends that evidence seized at the time of his arrest should have been suppressed both because the agents lacked probable cause to arrest him and because their entry into his building was illegal. We agree with his second contention and reverse his conviction.

On October 2, 1972, Special Agent Charles Stowell of the Bureau of Narcotics and Dangerous Drugs purchased heroin and marijuana from Jainne Degner and Daniel Carpenter in Long Beach, California. Stowell inquired whether he could obtain more narcotics that day. Degner, in Stowell's presence, called Phillips' office in Santa Monica and asked to speak to Phillips. Stowell heard Degner say, "Well, all right, I'll talk to you," and proceed to order additional quantities of heroin, cocaine, and marijuana from the person to whom she was speaking.

After placing the telephone order, Degner and Carpenter drove from Long Beach to 911 Pico Boulevard, Santa Monica, Phillips' business address. They were followed by agents working under the direction of Stowell. Degner entered the building, remained inside for a short time, and then returned to Long Beach with Carpenter, still followed by agents.

While Degner and Carpenter were being followed to Long Beach, other agents, reinforced by Santa Monica city police, gathered near 911 Pico Boulevard, under the supervision of Special Agent William T. Fuller. All the agents remained in radio contact with each other.

Shortly before Degner and Carpenter reached Long Beach, Agent Fuller decided to enter the building to arrest Phillips, whom he believed to be inside. At this time, the agents of the Fuller team and the Stowell team knew: (1) that Degner and Carpenter had been in the vicinity of 911 Pico Boulevard under surveillance earlier in the day, prior to making the first delivery and sale to Stowell; (2) that Degner had placed a telephone call to Phillips, at a telephone number shown on Phillips' business card, to order a second quantity of narcotics; (3) that, although the telephone number and the street address on the card pointed to Phillips, Degner probably did not speak to Phillips in her telephone call; and (4) that Degner and Carpenter made a second visit to 911 Pico Boulevard, remained a short time and returned to Long Beach. Because the officers entered the building a few minutes before Degner and Carpenter had reached Long Beach with the second delivery of narcotics for Stowell, the of-

---

* The Honorable William D. Murray, Senior United States District Judge for the District of Montana, sitting by designation.

ficers merely had some reason to believe, but did not know for a fact, that Degner and Carpenter had obtained narcotics from someone at 911 Pico Boulevard. For the purposes of testing probable cause in this case, we disregard the hearsay reports to various police officers to the effect that Phillips was a "dealer."

■ The agents had traced one known sale and a second probable sale to Phillips' business at 911 Pico Boulevard. They knew that Degner, from whom Stowell had purchased narcotics earlier in the day, had Phillips' business card and had called the number on that card, asking for Phillips. Even though Degner apparently did not speak to Phillips at that time, she was able to arrange a sale by talking to someone at his office. The fact that Degner had Phillips' card and asked for him, together with the recently observed, narcotics-related traffic in and out of his building, constituted sufficient probable cause to believe that Phillips was at least engaged in a conspiracy to distribute controlled substances.

Assuming that the agents had probable cause to arrest Phillips, the question then becomes: was the entry into the building a valid entry?

To gain entry into the building Agent Fuller asked the Santa Monica police officers to help. Under the direction of Fuller, the uniformed officers knocked on the door and asked permission to enter to investigate a report of burglary in the building. (There was, of course, no such report). After some delay, the door was opened by an occupant and the uniformed policemen entered, followed immediately by the undercover narcotic agents, who had emerged from hiding. Once inside, Fuller identified himself, and announced that he was securing the premises prior to obtaining a search warrant. Phillips was placed under arrest and voluntarily surrendered approx-

imately 178.2 grams of heroin and 15.3 grams of cocaine. Later, approximately forty minutes after the agents had entered, Phillips gave them written permission to search the building. Finally, he surrendered a container containing white powder, which he described as procaine with a trace of cocaine.

■■ The validity of an entry to execute an arrest, either with or without a warrant, is tested by criteria identical to those embodied in 18 U.S.C. § 3109.[1] Miller v. United States, 357 U.S. 301, 306, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). At least three separate purposes are said to underlie § 3109:

(1) It decreases the potential for violence. Particularly, the rule of announcement safeguards "officers, who might be mistaken, upon an unannounced intrusion into a home, for someone with no right to be there * * *." Sabbath v. United States, supra.

(2) It prevents the physical destruction of property. See Kaplan, Search and Seizure: A NO-MAN'S LAND IN THE CRIMINAL LAW, 49 Calif.L.Rev. 474, 501 (1961).

(3) It protects the individual's right of privacy. See Sabbath v. United States, supra at 589, 88 S.Ct. 1755.

Applying these principles to the entry at issue here, we hold that § 3109 should apply. An unannounced entry at midnight into an occupied and locked office building carries nearly as much potential for violence as an unannounced entry into a private residence. The potential for physical destruction of property is equal in either case. Finally, though respect for individual privacy is probably at its highest when an individual is in his home, his right of privacy is not forfeited when he locks himself into his office instead of his dwelling. See Lanza v. New York, 370 U.S. 139, 143, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962). Hence, we conclude that a locked com-

---

1. 18 U.S.C. § 3109 "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, aft-

er notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

mercial establishment, at least at night, is a "house" as that word is used in § 3109.

Here, federal narcotics agents obtained entry into Phillips' building by crowding in on the heels of uniformed police officers who had "knocked and announced." However, the permission which they elicited to enter was to investigate a report of a burglary, later found to have been invented by the federal agents.

Before the 1968 decision by the Supreme Court in Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968), this circuit twice held that entry obtained by ruse or deception did not violate 18 U.S.C. § 3109, since no "breaking" was involved. Dickey v. United States, 332 F.2d 773, 777–778 (9th Cir.), cert. denied, 379 U.S. 948, 85 S.Ct. 444, 13 L.Ed.2d 545 (1964) (narcotics agent falsely identified himself through a closed door as an informer known to the defendant); Leahy v. United States, 272 F.2d 487, 489–490 (9th Cir. 1959), cert. granted, 363 U.S. 810, 80 S.Ct. 1246, 4 L.Ed.2d 1152 (1960), dismissed by stipulation, 364 U.S. 945, 81 S.Ct. 465, 5 L.Ed.2d 459 (1961) (revenue agent gained admittance by stating that he was from the county assessor's office).

In Sabbath v. United States, supra, the Supreme Court held that federal agents, in effecting entry into Sabbath's apartment by opening its closed but unlocked door, did "break open" the door within the meaning of 18 U.S.C. § 3109. The court emphasized, 391 U.S. at 589, 78 S.Ct. at 1190, quoting from its earlier opinion in Miller v. United States:

"* * * The requirement of prior notice of authority and purpose before forcing entry into a home is deeply rooted in our heritage and should not be given grudging application. * * *." 357 U.S. at 313, 78 S.Ct. at 1198.

However, the Sabbath court later noted:

"We do not deal here with entries obtained by ruse, which have been viewed as involving no 'breaking'.

See, e. g., Smith v. United States * * * (supra); Leahy v. United States * * * (supra)." 391 U.S. at 590 n. 7, 88 S.Ct. at 1758.

In Ponce v. Craven, 409 F.2d 621, 625–626 (9th Cir. 1969), cert. denied, 397 U.S. 1012, 90 S.Ct. 1241, 25 L.Ed.2d 424 (1970), we held that entry by deception and without force did not violate a state statute very similar to § 3109. There, police officers directed a motel manager to announce that there was a telephone call for a woman in the room with the petitioner. When the door was opened, the police entered and arrested her and the petitioner. Our holding, however, was limited to an interpretation of the state statute, and Sabbath was not mentioned. We now conclude that our earlier, pre-Sabbath decisions are still good law and should be followed in this case.

We must now, however, look further and determine whether or not use of a ruse entry was warranted under these circumstances.

The Ninth Circuit recently stated in United States v. Glassell, 488 F.2d 143, Dec. 7, 1973:

"Under the rule of Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), an officer may legitimately obtain an invitation into a house by misrepresenting his identity as Mann did. If he is invited inside, he does not need probable cause to enter, he does not need a warrant, and, quite obviously, he does not need to announce his authority and purpose."

Our case, however, is distinguishable from both Glassell and Lewis. In Glassell, the undercover agents were invited into the petitioner's house with the understanding that they would complete a narcotics deal. In Lewis, the petitioner invited the undercover agent to his home for the specific purpose of executing a felonious sale of narcotics. The Supreme Court in Lewis stated:

"But when, as here, the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful busi-

ness, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street. A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant." 385 U.S. 206 at 211, 87 S.Ct. at 427.

In this case, unlike *Lewis* and *Glassell,* it cannot be said that the agents entered for the "very purposes contemplated by the occupant." The occupants were led to believe that they were admitting officers to investigate a burglary when, in fact, the officers and agents were entering to arrest Phillips.

 An officer without an arrest warrant certainly has no more license than an officer with a warrant in seeking entry to effect an arrest. The constitutional safeguard that assures citizens the privacy and security of their homes unless a judicial officer determines that it must be overridden, is applicable not only in case of entry to search for property, but also in cases of entry to arrest a suspect. Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385, 390 (1970). The Circuit Court for the District of Columbia listed six elements that have to be considered in justifying a warrantless entry to make an arrest: (1) That a grave offense is involved, particularly one that is a crime of violence; (2) That the suspect is reasonably believed to be armed; (3) A clear showing of probable cause to believe that the suspect committed the crime involved; (4) Strong reason to believe that the suspect is in the prem-

ises being entered; (5) A likelihood that the suspect will escape if not swiftly apprehended; and (6) The circumstance that the entry, though not consented, is made peaceably.[2] The court went on to say that the fact that the entry is made at night raises particular concern over its reasonableness and "may elevate the degree of probable cause required, both as implicating the suspect, and as showing that he is in the place entered." *Dorman, supra* at 393. The court concluded that, although there was no special knowledge that Dorman was home, concepts of probable cause and reasonableness prima facie justify looking for a man at home after 10:00 P.M.[3] The same circuit has held that before an officer can execute an arrest warrant at the residence of a third party not named in the warrant, the officer must have reason to believe that the person named in the warrant is present in the third person's residence. United States v. Brown, 151 U.S.App.D.C. 371, 467 F.2d 419, 423 (1972) citing United States v. Watson, 307 F.Supp. 173 (D.D.C.1969) in which the district court stated:

"An officer seeking entry in order to effect an arrest cannot accomplish his task if the person he is looking for is not inside. Consequently, absent consent,[4] the officer cannot enter by any means, breaking or otherwise, unless he has responsible cause to believe the defendant is within." 307 F. Supp. at 175.

In the more recent Ninth Circuit cases involving ruse entries, the agents all knew or had probable cause to believe that the suspect was in the building in question. In Leahy v. United States, *supra,* the officer waited until he saw Lea-

2. For purposes of this decision, the court is focusing on the 4th consideration. However, it should be noted that this crime was not a crime of violence. Also there was no reason to believe Phillips was armed and no reason to believe that Phillips would escape if not swiftly apprehended.

3. Although Phillips' place of business is considered a "home" for purposes of the protection afforded by the 4th Amendment, see text, *supra,* it is not his "home" for purposes of a presumption of his presence after

10:00 P.M., particularly since Phillips failed to respond to a phone call placed for him at the business address not long before the entry and arrest in question.

4. To be valid, a consent must be intelligently and knowingly given. Before a person can be deemed to have "knowingly" consented, he must be aware of the purpose for which the agent is seeking entry. *See* Lewis v. United States, *supra.* A ruse entry, by its very nature, runs contra to the concept of an intelligent consent or waiver.

hy enter the house before he gained entry by stating that he was from the county assessor's office. In Dickey v. United States, *supra,* the officers were told by an informant Lacey, that Dickey was in such and such a hotel room. An agent then gained entry by pretending to be Lacey. In Ponce v. Craven, *supra,* the officer actually observed the defendant in the motel room before he employed a ruse to gain entry.

This court cannot find that the telephone call placed by Degner to Phillips at his office in any way established probable cause to believe that Phillips was in his office. For some undisclosed reason, Degner did not speak to Phillips although she did arrange a sale with whomever answered the call. We do not know whether or not Phillips was there. The mere fact that Degner had Phillips' card and asked first for him, establishes no inference as to Phillips' presence in the office at that time. The fact that Degner arranged the sale with someone else suggests, if anything, that Phillips was not there.

An agent must have probable cause to believe that the person he is attempting to arrest, with or without a warrant, is in a particular building at the time in question before that agent can legitimately enter the building by ruse or any other means. To hold otherwise is to grant the agent a license to go from house to house employing ruse entries in violation of the right of privacy of the respective occupants.

In this case, the agents did not have probable cause to believe that Phillips was in the office building at the time of the raid and therefore the entry and subsequent arrest were invalid and the conviction must be reversed.

ALFRED T. GOODWIN, Circuit Judge (concurring in part and dissenting in part):

I concur in the first part of the majority's opinion, which holds that an entry obtained by means of a ruse such as the one employed here does not violate 18 U.S.C. § 3109. However, I dissent from that portion of the majority's opinion which holds that, because the agents lacked probable cause to believe that Phillips was in his own office building at the time of the raid, the entry and subsequent arrest must be invalidated.

I agree with the majority that before an officer can execute an arrest, with or without a warrant, at the residence of a third party, the officer must have reason to believe that the person named in the warrant is present in the third party's residence. I do not, however, agree that when the police have probable cause or a warrant to arrest a person, they cannot enter the suspect's own building to arrest him merely because they do not know, but only think, that he is inside.

Courts have properly denounced the police practice of searching from house to house until they find a suspect. Typically, it has been in the context of invasions of the property of those other than the arrestee that courts have spoken of the requirement that arresting officers must have probable cause to believe that the arrestee is on that property before they can enter to effect an arrest. *See, e. g.,* United States v. Brown, 151 U.S. App.D.C. 365, 467 F.2d 419, 423 (D.C. Cir. 1972); United States v. McKinney, 379 F.2d 259, 262–263 (6th Cir. 1967); Lankford v. Gelston, 364 F.2d 197, 201–204 (4th Cir. 1966); Restatement (Second) of Torts § 204 (1965). Certainly, entering the property of a third party is quite different from entering the office building of the arrestee himself. The affront to the rights of an innocent party is far greater in the former case.

The majority relies heavily upon the opinion of the Court of Appeals for the District of Columbia Circuit in Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385 (1970). However, as the majority points out, the court there conceded that, though the police had no special knowledge that the suspect was at home, "concepts of probable cause and reasonableness prima facie justify looking for a man at home after 10 p. m." 435 F.2d at 393. Looking at all the probabilities here, I should think that they would preponderate in favor of

Phillips' being in his building where all the action was, rather than at home or somewhere else.

The majority concludes by observing that a contrary result here would be "to grant the agent a license to go from house to house employing ruse entries in violation of the right of privacy of the respective occupants." I do not understand how sustaining the arrest in this case could spawn such progeny. The agents were not going from house to house searching for Phillips; rather, they went directly to his own office building, which had been the focus of their investigation, and at which they knew narcotics transactions had recently taken place. No other person's privacy was remotely endangered.

I would affirm the judgment of conviction.